## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF RHODE ISLAND

| In Re: | Case Number 09-11809-DF |
|---|---|
| Adriano Freire and Lourdes Mendes | Chapter 13 |

## MOTION OF MIDFIRST BANK TO COMPEL SURRENDER

The Debtors, having surrendered the real property located at 204 Morris Avenue, Pawtucket, Rhode Island, have thereby relinquished their right to possession thereof and must now cease and desist from their efforts opposing MidFirst Bank's post-foreclosure state court actions for possession.

### Introduction

On October 4, 2016, the United States Court of Appeals for the Eleventh Circuit issued its opinion in *Failla v. Citibank, N.A. (In re Failla)*, ____ F.3d _____ (11th Cir. 2016), 63 Bankr. Ct. Dec. 46.[1]  The essential and applicable holding of *In re Failla* is that a Debtor who surrenders collateral pursuant to 11 U.S.C. § 521(a)(2) may <u>NOT</u> oppose the creditor's subsequent state law actions to obtain possession of said collateral.

In this case, Debtors surrendered the real property located at 204 Morris Avenue, Pawtucket, Rhode Island, by operation of law and subsequent thereto, MidFirst Bank non-judicially foreclosed thereon.   Subsequent to the foreclosure, the Debtors have opposed MidFirst's state law actions to secure title to and possession of the collateral in contravention of their obligations under 11 U.S.C. § 521(a)(2).

As recognized and affirmed by the 11th Circuit in *In re Failla*, this Court has the authority pursuant to 11 U.S.C. § 105(a) to "order the Debtors to withdraw their affirmative

---

[1]   A copy of the decision in *In re Failla* is filed herewith.

1

defenses and dismiss their counterclaim[s] in the [State Court Actions]." *In re Failla, supra*, at p. 16, citing *In re Lapeyre*, 544 B.R. 719, 723 (Bankr. S.D. Fla. 2016).

## Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (O).

## Relief Requested

Pursuant to 11 U.S.C. § 521(a)(2)(B), MidFirst moves the Court  for an order compelling the Debtors to surrender the Property to MidFirst.

## Facts and Travel

On May 7, 2009, Debtor's filed their Chapter 13 Petition.  The Creditor Matrix listed Midland Mortgage, P.O. Box 26648, Oklahoma City, OK 73126-0648 and Korde & Associates, P.C.[2]

Debtors' Schedule A reflected that Debtors owned the property located at 204 Morris Avenue, Pawtucket, RI at the time of their Bankruptcy and that there was a secured claim in the amount of $286,952.99 standing against the property.

Debtors' Schedule D reflected that Midland Mortgage, P.O. Box 26648, Oklahoma City, OK 73126-0648, held a mortgage on the Property and that at the time of the Bankruptcy, the amount owed was $247,236.05.

On May 22, 2009, MidFirst Bank, c/o Midland Mortgage Company, its Loan Servicer, and by and through its Counsel, Korde & Associates, filed its Proof of Claim.  Attached to the

---

[2]   Midland Mortgage was the Loan Servicer for Secured Creditor, MidFirst Bank, and Korde & Associates, P.C., were Foreclosure Counsel for MidFirst Bank and were pursuing a foreclosure of the Debtors' mortgage of the subject property at the time of the bankruptcy filing.

Proof of Claim was a copy of (1) the recorded Mortgage (Claim 5-1, Part 3); the Note (Claim 5-1, Part 4); and, a copy of the recorded Assignment of Mortgage (Claim 5-1, Part 5).

On May 26, 2009, the Defendants filed their Chapter 13 Plan accompanied by a Motion to Modify Secured Claims.  In Section IV of the Plan, Secured Claims, subsection A. Mortgages and Other Direct Payments by Debtor, the Plan states:  "Payments will be made outside the plan according to the original contract terms, with no modification of contract terms and with liens retained.

| Name of Creditor | Description of Collateral | Contractual Monthly Payments | Principal Balance of Claim | Contract Rate of Interest |
|---|---|---|---|---|
| Midland Mortgage | 204 Morris Avenue Pawtucket, RI 02860 | $1485.00 | $135,000.00 less arrearage | 5.675% |

On June 19, 2009, MidFirst Objected to the Confirmation of Debtors' Plan.  As part of the objection, MidFirst attached a copy of the Note (Document 19-3); the Mortgage (Document 19-4); and, the Assignment of Mortgage (Document 19-5).

On July 6, 2009, MidFirst Bank, c/o Midland Mortgage Company, its Loan Servicer, and by and through its Counsel, Korde & Associates, filed its Amended Proof of Claim.  Attached to the Amended Proof of Claim was a copy of (1) the recorded Mortgage (Claim 5-2, Part 2); the Note (Claim 5-2, Part 3); and, a copy of the recorded Assignment of Mortgage (Claim 5-2, Part 4).[3]

On July 21, 2009, the Bankruptcy Court entered an Order Denying Confirmation of the Chapter 13 Plan

---

[3]   At no time during the course of their Bankruptcy did Debtors ever file an objection to MidFirst's Proof of Claim or Amended Proof of Claim.  Moreover, the Court will observe that NO OTHER entity filed a Proof of Claim with respect to the subject Note and Mortgage.

3

On August 3, 2009, the Debtors filed their First Amended Chapter 13 Plan accompanied by a Motion to Modify Secured Claims.    In an <u>Attachment</u> to the Plan, the Defendants "reserve[d] the right to object to the secured statues (sic) of the claim of Midland Mortgage, *if the Debtors find that the Note and Mortgage is not held by Midfirst Bank.  Debtors are objecting to the Claim filed by Midland Mortgage as Servicer on the grounds that the Assignment of Mortgage was not signed by an employee of First Horizon Home Loans*.  If this assignment is invalid, there will either be no claim or an unsecured claim with no arrearage."  Italics added for emphasis.

In Section IV of the Plan, <u>Secured Claims</u>, subsection A. Mortgages and Other Direct Payments by Debtor, the Plan states:  "Payments will be made outside the plan according to the original contract terms, with no modification of contract terms and with liens retained.

| Name of Creditor | Description of Collateral | Contractual Monthly Payments | Principal Balance of Claim | Contract Rate of Interest |
|---|---|---|---|---|
| Midland Mortgage | 204 Morris Avenue Pawtucket, RI 02860 | $1485.00 | $135,000.00 less arrearage | 5.675% |

On August 25, 2009, MidFirst Objected to the Confirmation of Debtors' First Amended Plan.   As part of the objection, MidFirst attached a copy of the Note (Document 34-2); the Mortgage (Document 34-3); the Assignment of Mortgage (Document 34-4); and, an Action of Chief Human Resources Officer of First Tennessee Bank National Association (The "Bank") Pursuant to Sections 4.2 and 4.19 of the Bylaws of the Bank (Document 34-5).

In particular, in response to the Debtors' <u>Attachment</u> MidFirst argued:

> 22. The Debtors attempt in an "Attachment" to their First Amended Plan to reserve the right to object to the secured status of MidFirst's claim based on the Debtor's naked assertion that the Note and Mortgage are not held by Midfirst Bank.

4

23. Procedurally, the Debtor's First Amended Plan cannot also serve as a claim objection cognizable under the rules as it fails to comport with the requirement of Local Rule 3007-1 in that it fails to contain the conspicuous notice required under such Rule.

24. Substantively, there is no merit to the Debtor's assertion that Midfirst is not the holder of the Note and Mortgage:

(a) *Midfirst is in custody and control of the original promissory note as endorsed in blank by First Horizon Home Loan Corporation; the Note is presently in the physical possession of under signed counsel for purposes of this litigation and is available for review and inspection by the Debtor and/or Debtor's counsel at such time and place as may be mutually agreed upon by the respective counsel to Midfirst and the Debtor*;

(b) *A valid assignment of the Mortgage from the successor by merger to the original mortgagee in favor of Midfirst Bank has been duly recorded with the City of Pawtucket Land Evidence Records.*
(c) *Midfirst has produced herewith evidence of the Assignment signatory's authority to execute assignments on behalf of First Tennessee Bank National Association as successor by merger to First Horizon Home Loan Corporation.*

25. Midfirst further contends that its proof of claim, as amended, conforms with the requirements of Bankruptcy Rule 3001 and as such it constitutes prima facie evidence to the amount and validity of the claim.  The Debtor has failed to produce any documentation or advance any argument sufficient to overcome this presumption of validity.   The Debtor has produced no authority for the proposition that an entity cannot delegate the task of executing and processing mortgage assignments and discharges to a person who is not an employee of such entity and bestow sufficient authority on him or her to do so.

26. In the event the Court were to regard the Debtor's First Amended Plan as a valid clams objection cognizable under the Local Rules, Midfirst respectfully requests that the Court set down an evidentiary hearing date so as to afford Midfirst sufficient opportunity to elicit testimony and/or to admit evidence in support of its claim.

Bold and italic added for emphasis.

5

On September 9, 2009, the Parties filed a Stipulation and Joint Statement of Issues Pertaining to Plan Confirmation.  In said Stipulation, the Parties agreed that the Debtors' First Amended Plan intended to treat the Debtors' Mortgage in the same manner as the Debtor in *In re Veliz* and further indicated that the issues related to such a plan "have been fully briefed by undersigned counsel on behalf of similarly situated clients in the matter of Sairy Veliz, case no. 08-13292 (the Debtor's brief in such case was filed as docket no. 54 and the creditor's brief was filed as docket no. 55). The undersigned parties to this Stipulation agree to be bound by the Court's resolution of the foregoing issues in the matter of Sairy Veliz."  Additionally, the Stipulation preserved the Debtors' rights to object to MidFirst's Proof of Claim (See page 3, last paragraph) something which they never did.

On October 16, 2009, Bankruptcy Judge Votolato issued his Order Denying Confirmation of the *Veliz* Plan.  See *In re Veliz*, Bk No. 08-13292, 101609 RIBC, 2009 WL 3418638.

On February 1, 2010, the Debtors filed a Notice and/or Request for Loss Mitigation.  In their Request, Defendants identified the name of the Creditor as "First Horizon Home Loan Corp. ***C/O Midland Mortgage***."  Bold and italic added for emphasis.

On February 4, 2010, a hearing was held on MidFirst's Objection to the First Amended Plan at which Defendants' Attorney "request[ed] that all matters be continued.  *The debtor has just filed a request for loss mitigation*."  Italics added for emphasis.

On February 17, 2010, the Court entered a Loss Mitigation Order directing the Defendants and *First Horizon Home Loan Corp. c/o Midland Mortgage* to participate in loss mitigation and further directing that the pending Objection to Confirmation of Plan be continued for hearing at the Status Conference on April 15, 2010.

6

On March 3, 2010, <u>MidFirst</u> filed its Notice of Designation of Loss Mitigation Contact.[4]

Thereafter, <u>and until February 1, 2011</u>, the Debtors and <u>MidFirst</u> were engaged in Loss Mitigation efforts.

On January 18, 2011, MidFirst filed a Statement Regarding Debtors' Non-Eligibility for Relief Under the FHA HAMP Program in which it indicated:

> 2.   **_Midfirst holds a first mortgage_** on a two-family dwelling owned by the Debtors and known as 204 Morris Avenue, Pawtucket, Rhode Island (the "Property") as duly recorded with the City of Pawtucket Land Evidence Records in Book 2052, Page 215 (the "Mortgage").
>
> 3.   The Debtor filed an Amended Plan on August 3, 2009 (#27) to which **_Midfirst timely objected_** (#34).
>
> 4.   The Debtor filed [a] Request for Loss Mitigation on February 1, 2010 (#46) and an Order granting Loss Mitigation entered on February 17, 2010 (#48).
>
> 6.   **_Midfirst Bank filed an Amended Proof of Claim_** (#5 on the Claims Register) evidencing a total debt claim of $245,171.07 including prepetition arrears of $14,933.31.  **_No objections to the claim have been filed._**
>
> 7. – 17.   [Loss Mitigation analysis with resulting determination that the Debtors did not qualify for any retention forms of loss mitigation.]
>
> 18.   Thus, Midfirst respectfully requests that the Loss Mitigation Period be terminated.

Bold and italic added for emphasis.

On January 31, 2011, the Debtors withdrew their Request for Loss Mitigation.

On February 1, 2011, the Court vacated the Loss Mitigation Order.

On March 8, 2011, the Court denied confirmation of the First Amended Plan.

---

[4]   The Court will observe that AT NO TIME did First Horizon Mortgage Loan Corp ever appear in the Defendants' Bankruptcy case and that at ALL TIMES in relation thereto, Defendants were engaged in the Bankruptcy process with MidFirst.  Moreover, AT NO TIME did Defendants ever object to MidFirst's participation in the Loss Mitigation process despite the fact that the Loss Mitigation Order was addressed to "First Horizon Home Loans."

On April 6, 2011, MidFirst filed its Motion for Relief from Stay to be allowed to proceed with its foreclosure of the Mortgage.  As part of the Motion, MidFirst attached a copy of the Note (Document 126-5); the Mortgage (Document 126-6); and, the Assignment of Mortgage (Document 126-4).

On April 22, 2011, Debtors' filed their Second Amended Plan accompanied by a Motion to Modify Secured Claims.  In Section XIII of the Plan, the Debtors stated the following:

> Debtors have filed in this Plan a Motion to Modify their first mortgage with First Horizon Home Mortgage Corporation, *or its secured assignee* and bifurcate it into a secured claim in the amount of the value of the property and an unsecured claim as to the balance.

> Upon completion of the Plan, an Order granting the Motion to Modify shall be recorded in the Land Evidence Records of the City of Pawtucket.

> Debtors have filed in this Plan a Motion to Modify the Second Mortgage with Beneficial Mortgage Co., of Rhode Island or its secured assignee and treat it as an unsecured claim due to the value of the property.

> Upon completion of the Plan, an Order dismissing the second mortgage shall be recorded in the Land Evidence Records of the City of Pawtucket.

> Debtors reserve the right to file an Amended Plan with a motion to modify their mortgage in the event that 11 USC 1322 is amended allowing Debtors to modify their mortgage pursuant to the terms of Title 11 of the United States Code as it may become amended.

In Section IV, <u>Secured Claims</u>, subsection A. Mortgages and Other Direct Payments by Debtor, the Plan states:  "Payments will be made outside the plan according to the original contract terms, with no modification of contract terms and with liens retained.

| Name of Creditor | Description of Collateral | Contractual Monthly Payments | Principal Balance of Claim | Contract Rate of Interest |
|---|---|---|---|---|

| First Horizon Home Mortgage Corporation *or its secured assignee* | 204 Morris Avenue Pawtucket, RI 02860 | Amount to be determined | $135,000.00 | 5.675% |
|---|---|---|---|---|

On April 25, 2011, Debtors filed their Objection to Motion for Relief from Stay in which they challenged the assignment of their mortgage, the validity of the indorsement on their note and the ownership of their mortgage.

On April 27, 2011, a Hearing was held on the Motion for Relief from Stay.  After the Hearing, the Court entered an Order as follows:  "The parties will argue standing issue and expect that the hearing will be under 4 hours.  The Court states that the issue may be similar to a matter that is under advisement at the BAP [Bankruptcy Appellate Panel]."

On May 18, 2011, MidFirst Objected to the Confirmation of Debtors' Second Amended Plan.  As part of the objection, MidFirst attached a copy of the Note (Document 149-3); the Mortgage (Document 149-4); the Assignment of Mortgage (Document 149-5); and, an Action of Chief Human Resources Officer of First Tennessee Bank National Association (The "Bank") Pursuant to Sections 4.2 and 4.19 of the Bylaws of the Bank (Document 149-6).

On August 18, 2011, MidFirst and Debtors filed a Joint Motion to Reschedule Evidentiary Hearing and Enlarge Pretrial Order date.   In said Joint Motion the Parties represented that "***the Debtors have recently provided MidFirst with proof of new income which may make the Debtors eligible for various loss mitigation options that are available as an alternative to foreclosure. MidFirst is willing, in the interim provided should the Court allow this motion, to review the documentation recently submitted by the Debtors to determine their eligibility for such loss mitigation options***."  Bold and italics added for emphasis.

On August 30, 2011, Debtors filed their Notice of Voluntary Conversion to Chapter 7 and as a result thereof, no hearing on the Second Amended Plan was ever held.

On October 11, 2011, MidFirst withdrew its Motion for Relief from Stay and the Court terminated the Relief from Stay proceedings on October 12, 2011.

On November 1, 2011, the Chapter 7 Trustee issued a Report of No Distribution as follows: "Trustee of this estate reports and certifies that the trustee has performed the duties required of a trustee under 11 U.S.C. 704 and has concluded that there are no assets to administer for the benefit of creditors of this estate. I have received no funds or property of the estate, and paid no monies on account of the estate. Wherefore, the trustee prays that this report be approved and the trustee be discharged from office."

On December 1, 2011, the Debtors received their Discharge. Paragraph 2 of the Section Entitled: "Collection of Discharged Debts Prohibited" found on Page 2 of the Discharge states in relevant part that "a creditor may have the right to enforce a valid lien, such as a mortgage or security interest, against the debtor's property after the bankruptcy, if that lien was not avoided or eliminated in the bankruptcy case."

On June 14, 2012, the Debtors' property was sold at foreclosure auction by the MidFirst and MidFirst was the high bidder thereat. Thereafter, on June 28, 2012, a Statutory Form of Foreclosure Deed Under Power of Sale in Mortgage was executed by the MidFirst as the foreclosing mortgagee deeding the Property to the MidFirst as the high bidder at the foreclosure sale and said Foreclosure Deed was recorded with the City of Pawtucket Land Evidence Records on July 5, 2012, in Book 3495, Page 1. A true and accurate copy of said Deed is attached hereto as Exhibit 1.

On August 22, 2012, Debtors filed an action against MidFirst and the Government National Mortgage Association (GNMA) in the United States District Court for the District of Rhode Island under Case No. 12-cv-00603-M-LDA. A true and accurate copy of the Docket for

said District Court Case as downloaded from the Official Website for the United States District Court for the District of Rhode Island (PACER) is attached hereto as Exhibit 2. A true and accurate copy of the Complaint is attached hereto as Exhibit 3.

On October 24, 2013, the Government National Mortgage Association (GNMA) filed its Motion to Dismiss the action. A true and accurate copy of said Motion to Dismiss is attached hereto as Exhibit 4.

On March 29, 2014, Debtors filed a Notice of Dismissal of their action against MidFirst and GNMA. See Exhibit 2.

In September 2014[5], an Agent of MidFirst posted the Property as required by R.I.G.L. § 34-18-38.2(b)(3), but failed to take pictures documenting said posting as requested by MidFirst. See Affidavit of Posting Pursuant to R.I.G.L. § 34-18-38.2(b). See Exhibit 6 and Affidavit attached thereto.

A few days later, on September 17, 2014, the Agent of MidFirst returned to the Property in an effort to take pictures documenting the posting. Upon reaching the property, MidFirst's Agent was met at the gate by Debtor, Adriano Freire, who refused to allow MidFirst's Agent entry onto the Property and instead, handed said Agent his attorney's card. See Exhibit 6 and Affidavit attached thereto.

On December 12, 2014, Undersigned Counsel for MidFirst sent an e-mail to Attorney John Ennis, Counsel for the Debtors, seeking access to the Property so that it could be posted/re-posted in compliance with R.I.G.L. § 34-18-38.2(b)(3) and so that pictures documenting the same could be taken. After two weeks without a reply, on December 30, 2014, MidFirst's

---

[5]   The delay between the execution and recording of the Foreclosure Deed in 2012 and the eventual posting of the Property in 2014 after the passage of R.I.G.L. §§ 34-18-38.1 and 34-18-38.2 can be explained in large part by the Debtors filing of the federal action which became part of the Foreclosure Master Docket.

Counsel once again e-mailed Attorney Ennis who then replied that MidFirst "has no rights to come onto the property." See Exhibit 6 and Affidavit attached thereto.

As a result of the foregoing, on February 17, 2015, MidFirst filed an action in Providence Superior Court, Case No. PC-2015-0646, against the Debtors to quiet title to the subject property. A true and accurate copy of the Docket from said Action is attached hereto as Exhibit 5. A true and accurate copy of the Complaint is attached hereto as Exhibit 6.

On March 17, 2015, the Debtors answered and counterclaimed in the Superior Court Action. A true and accurate copy of the Answer and Counterclaims is attached hereto as Exhibit 7.

Then, on July 6, 2016, MidFirst filed two actions for trespass and ejectment in 6th Division District Court against the Debtors, Case Nos. 6CA-2016-05692 and 6CA-2016-05693.[6] A true and accurate copy of the Docket from 6CA-2016-05693 is attached hereto as Exhibit 8. A true and accurate copy of the Complaint in said Action is attached hereto as Exhibit 9.

On September 14, 2016, Debtors filed an answer and counterclaim. A true and accurate copy of the Answer and Counterclaims is attached hereto as Exhibit 10.

## Argument

### Debtors' Surrender of the Property Pursuant to 11 U.S.C. § 521(a)(2) Requires That They Cease and Desist Their Opposition to MidFirst's Actions to Obtain Possession

11 U.S.C. § 521(a)(2) states:

(a)  The debtor shall . . .

    (2)  if an individual debtor's schedule of assets and liabilities includes debts which are secured by property of the estate—

---

[6]  Two cases were filed because the property is a two family structure and the Debtors retained possession, custody and control over both units post-foreclosure. In 6CA-2016-05692, Debtors filed an answer with affirmative defenses. In 6CA-2016-04693, Debtors filed an answer and counterclaims. For purposes of this motion, MidFirst attaches documents from the 6CA-2016-04693 Action.

12

(A) within thirty days after the date of the filing of a petition under chapter 7 of this title or on or before the date of the meeting of creditors, whichever is earlier, or within such additional time as the court, for cause, within such period fixes, file with the clerk a statement of his intention with respect to the retention or surrender of such property and, if applicable, specifying that such property is claimed as exempt, that the debtor intends to redeem such property, or that the debtor intends to reaffirm debts secured by such property; and

(B) within 30 days after the first date set for the meeting of creditors under section 341(a), or within such additional time as the court, for cause, within such 30-day period fixes, perform his intention with respect to such property, as specified by subparagraph (A) of this paragraph;

except that nothing in subparagraphs (A) and (B) of this paragraph shall alter the debtor's or the trustee's rights with regard to such property under this title, except as provided in section 362(h);

"The statement of intention must declare one of four things:  the collateral is exempt, the debtor will surrender the collateral, the debtor will redeem the collateral, or the debtor will reaffirm the debt." *In re Failla, supra,* at p. 5 citing *In re Taylor*, 3 F.3d 1512, 1516 (11th Cir. 1993). See also *In re Silvestri*, BK No. 02-13184, 2004 Bankr. LEXIS 1862, 2004 WL 2610032 (Bankr. D.R.I. June 14, 2004) (Votolato, U.S. Bankruptcy Judge) (Order on Remand).

Consequently, "Section 521(a)(2) requires a debtor to either redeem, reaffirm, ***or surrender collateral to the creditor***." *In re Failla, supra*, at p. 13.  Bold and italics added for emphasis.  See also *In re Silvestri, supra*.

The Court of Appeals for the First Circuit has sided with the "exclusivity" group.  See *Bank of Boston v. Burr (In re Burr)*, 160 F.3d 843 (1st Cir. 1998).  In *Burr*, the Court stated: "we believe that 11 U.S.C. § 521(2) unambiguously requires chapter 7 debtors wishing to retain property of the estate that secures a consumer debt to elect one of the retention options specified in 11 U.S.C. § 521(2)(A), and then to perform the elected option in accordance with 11 U.S.C. § 521(2)(B)."  Id. at 849.  However, the *Burr* decision did not address the issue of what consequences flow from a debtor's failure to make or perform such an election or what

remedies are available to a secured creditor if the debtor fails to
meet his or her obligations under Burr.

*In re Donnell*, 234 B.R. 567, 570 (Bankr. D.N.H. 1999).

In this case, Debtors converted their Chapter 13 case to a Chapter 7 case on August 30,

2011. They failed, however, to file a statement on intention.[7]   Nonetheless, on November 1,

2011, the Chapter 7 Trustee issued a Report of No Distribution.

---

[7]   In *In re Donnell*, the Court observed that "[b]ecause the Debtors fulfilled their § 521(2)(A) duties, the Court is not
required to pass on what remedies are available to a secured creditor when a debtor fails to file a statement of
intention within the requisite time period. The Court leaves that issue for another day.  Fn. 3:  Some courts suggest
that the appropriate sanction may be to allow dismissal of the bankruptcy case pursuant to § 707(a).  See, e.g.,
Beneficial New York, Inc. v. Bushey (In re Bushey), 204 B.R. 661, 663 (Bankr. N.D.N.Y. 1997) (citing In re Green,
119 B.R. 72 (Bankr. D. Md. 1990)).  This Court does not need to decide in this case whether such a sanction would
be appropriate." *Id.*

MidFirst would suggest the following sanction on the facts of this case:  Deem the property surrendered by
operation of law since it was neither redeemed nor the debt reaffirmed; it was subsequently abandoned by the
Trustee; the Debtors were discharged and the case closed; and, post-bankruptcy, MidFirst exercised its state law
remedies via a non-judicial foreclosure.  See *In re Pratt*, 462 F.3d 14, 19 (1st Cir. 2006) (" Where the debtor decides
not to reaffirm, or the parties cannot negotiate a reaffirmation, or redemption is not economically feasible, the debtor
has but one option: 'surrender' the collateral.").

In *In re Donnell*, the Court discussed four possible solutions:  (1)  Compel the Debtor to Perform.  (2)  Dismiss
the Case pursuant to 11 U.S.C. § 707(a).  (3)  Render the Underlying Debt Non-Dischargeable pursuant to 11 U.S.C.
§ 523(a).  (4)  Grant Relief from Stay pursuant to 11 U.S.C. § 362.  *Id.*, at pp. 572 – 574.

The Court in *In re Donnell* eschewed the first option because the case was still ongoing and it felt that the case
did not present the unique circumstances which justified the extraordinary relief that a motion to compel would
entail.  In this case, however, the Court's decision *In re Failla* readily resolves those concerns.

As for the second option, the estate has arguably already been administered and the case has been closed, so
there is nothing to dismiss.  Presumably, the case could be reopened, the discharge vacated (a variant of option 3)
and then dismissed.  But this is hardly feasible for the same reason that option 3 is not feasible.

As for option 3, declaring the debt non-dischargeable (or in this case, vacating the discharge) would be futile
since MidFirst has already foreclosed and there is really no likelihood that MidFirst could ever recover any
deficiency from these Debtors.  In effect, the economic reality that it makes no sense to spend good money after bad
("you can't get blood out of a stone") results in a *de facto* discharge in any event.

Finally, option 4 is inapplicable because the mortgage loan has already been foreclosed.  See also *In re Failla,
supra*, at p. 15:  "The automatic stay is *always* lifted at the end of the bankruptcy proceedings, *see* 2 Bankruptcy
Law Manual § 10:7 (5th ed.), so this remedy does nothing to punish debtors who lie to the bankruptcy court about
their intent to surrender property."  Italics in original.  Or who, as in this case, lie in the weeds by failing to file a
statement of intention in the first place.

A review of the Court's file will reveal that the Debtors did not claim that the property was exempt; nor did they redeem the property; nor did they reaffirm the mortgage loan debt. Thus, by operation of law, they surrendered the property to the Secured Creditor, MidFirst.  See *In re Failla, supra,* at p. 6: "We agree with both the district court and the bankruptcy court that section 521(a)(2) requires debtors who file a statement of intent to surrender to surrender the property both to the trustee **and to the creditor**.  Even if the trustee abandons the property, **debtors' duty to surrender the property to the creditor remains**.  The text and the context of the statute compel this interpretation" and at p. 7: "What Congress *did* say in section 521(a)(2) is "surrender," without specifying to whom the surrender is made.  But the lack of an object makes sense because a debtor who decides to surrender his collateral must surrender it to **both the trustee and the creditor**.  The debtor first surrenders it to the trustee, *id.* § 521(a)(4), who decides whether to liquidate it, *id.* § 704(a)(1), or abandon it, *id.* § 554.  **If the trustee abandons it, then the debtor surrenders it to the creditor, id. § 521(a)(2).**"  Bold and italics added for emphasis.

What this means is that the Debtors may NOT oppose the Creditor's state law efforts to take possession of the property.  See *In re Failla, supra,* at p.9: "We also agree with the bankruptcy court and the district court that "surrender" requires debtors to drop their opposition to a foreclosure action"[8] and at p. 10: "Another meaning of 'surrender' is '*[t]he giving up of a right or claim*.' *Surrender*, *Black's Law Dictionary* (10th ed. 2014); *see also Surrender*, *Webster's New International Dictionary* 2539 ('To give up completely; to resign; relinquish; as, to *surrender* a right, privilege, or advantage.'). This meaning describes a legal relationship, as

---

[8]   Florida is a judicial state (i.e., the foreclosure is conducted by and through the Courts).  Rhode Island, on the other hand, allows for non-judicial foreclosures.  See R.I. Gen Laws § 34-27-1.  The fact that *In re Failla* arises in the context of a judicial foreclosure action does NOT limit its applicability here.  It makes no sense to say that the Debtors surrendered the property such that MidFirst could conduct a non-judicial foreclosure only to be stymied by the Debtors when MidFirst attempted to realize upon the title acquired via that foreclosure.

opposed to a physical action, which makes sense in the context of section 521(a)(2)—a provision

that describes other legal relationships like 'reaffirmation' and 'redemption.'  This definition is

in line with existing authorities.  *See In re Pratt*, 462 F.3d 14, 18–19 (1st Cir. 2006) ('[T]he most

sensible connotation of 'surrender' in the . . . context [of section 521(a)(2)] is that the debtor

agreed to make the collateral *available* to the secured creditor—*viz.*, to cede his possessory rights

in the collateral . . . .'); . . ."

Consequently, "Because 'surrender' means 'giving up of a right or claim,' debtors who

surrender their property can no longer contest a foreclosure action.  When the debtors act to

preserve their rights to the property 'by way of adversarial litigation,' they have not

"relinquish[ed] . . . all of their legal rights to the property, including the rights to possess and use

it." *White*, 487 F.3d at 206 (emphasis omitted).  The 'retention of property that is legally

insulated from collection is inconsistent with surrender.' *Id.* at 207." *In re Failla, supra*, at p.

11.

Thus, not only have Debtors given up their right to retention of the property, they have

also surrendered their right to challenge MidFirst's status as the Creditor entitled to the property.

As a consequence thereof, "[a] debtor who promises to surrender property in bankruptcy court

and then, once his debts are discharged, breaks that promise by opposing a foreclosure action in

state court has abused the bankruptcy process.  *See Guerra*, 544 B.R. at 710." *In re Failla,*

*supra*, at p. 15.

Finally, this Court has the authority to order the Debtors to cease and desist in their

opposition in the pending state court actions and to dismiss their counterclaims and withdraw

their answers and affirmative defenses.  "Just as the bankruptcy court may 'order[] creditors who

violate the automatic stay to take corrective action in the non-bankruptcy litigation,' the

16

bankruptcy court may 'order the Debtors to withdraw their affirmative defenses and dismiss their counterclaim in the Foreclosure Case.' *Id.* The bankruptcy court had the authority to compel the Faillas to fulfill their mandatory duty under section 521(a)(2) not to oppose the foreclosure action in state court." *In re Failla, supra*, at p. 16.

The District Court decision in *Ibanez v. U.S. Bank Nat'l Ass'n*, 856 F. Supp. 2d 273 (D. Mass. 2012) compels the same result.[9]

The relevant facts of *Ibanez* are as follows:

> Three weeks after the [foreclosure] sale, on July 26, 2007, Ibanez filed for Chapter 7 bankruptcy. On the Schedule A listing of real property accompanying the petition, Ibanez listed $1,215,894.32 in secured debt, including the $111,640.26 debt secured by the mortgage on Crosby Street. See Sand Canyon Mot. for J. on the Pleadings- Ex. A. Ibanez listed the market value of the property as $97,160. Id. On the Schedule D listing of creditors, Ibanez included $111,000 as secured debt owed to Option One, as well as an additional unsecured indebtedness on Crosby Street of $13,840. Id. On Ibanez's statement of intention, he indicated that he would surrender Crosby Street, along with five other properties that he owned in Springfield. Id. On the Schedule B listing of personal property, Ibanez did not include any potential cause of action against defendants relating to the foreclosure. Id. Ibanez (and his spouse) were discharged of their debts pursuant to 11 U.S.C. § 727, on October 24, 2007. See id.- Ex. B. On October 31, 2007, the bankruptcy case was terminated pursuant to 11 U.S.C. § 350(a). See id.- Ex. C.
> In July of 2011, in the wake of the SJC's decision, Ibanez filed a Complaint against U.S. Bank as Trustee, Sand Canyon Corp., and AHMSI in the Superior Court. In October of 2011, AHMSI removed the case on diversity grounds to this court with the assent of U.S. Bank as Trustee and Sand Canyon. See 28 U.S.C. §§ 1332, 1441, and 1446. Ibanez then moved to remand the action, but this court denied the motion on November 29, 2011. Defendants now move for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).

*Ibanez, supra*, at 274 – 275.

---

[9] A copy of the *Ibanez* decision is filed herewith.

On these facts, the District Court stated that "[t]he gist of the matter is this. Ibanez is seeking to capitalize in this court on the holding in the SJC's opinion bearing his name *by invoking the wrongful foreclosure of the same property that he surrendered in the Bankruptcy Court in exchange for the discharge of his debts*. *This, equity will not permit*. See Perry v. Blum, 629 F.3d 1, 8 (1st Cir. 2010), citing InterGen N.V. v. Grina, 344 F.3d 134, 144 (1st Cir. 2003) 'The doctrine of judicial estoppel . . . operates to prevent a litigant from taking a litigation position that is inconsistent with a litigation position successfully asserted by him in an earlier phase of the same case or in an earlier court proceeding. . . . The purpose of the doctrine is to protect the integrity of the judicial process. It is typically invoked when a litigant tries to play fast and loose with the courts.)." *Ibanez, supra*, at 275. Bold and italic added for emphasis.

Thus, the Court concluded that "Ibanez's surrender of his claim to Crosby Street in the Bankruptcy Court is still fatal to his claims in this court. See In re Pratt, 462 F.3d 14, 18-19 (1st Cir. 2006), citing 11 U.S.C. § 521(a)(2) ("[T]he most sensible connotation of 'surrender' in the [Chapter 7] context is that the debtor agreed to make the collateral available to the secured creditor — viz., to cede his possessory rights in the collateral — within 30 days of the filing of the notice of intention to surrender possession of the collateral."). Thus, even were there a claim, it does not belong to Ibanez." *Ibanez, supra*, at 276.

Finally, the Court noted that:

> "[a]s a last grasp, Ibanez argues that had the void foreclosure not taken place, he might have avoided any injury because he could have received some sort of 'loss mitigation measure,' a delayed foreclosure date, or, perhaps, defendants might not have pursued the foreclosure to completion. Yet, by Ibanez's own reasoning, the time when defendants 'unlawfully deprived [him] of the Property' occurred ten months *after* he had surrendered his interest in Crosby Street. *To argue that he was injured by the invalid foreclosure of*

18

> ***a property in which he no longer held any legal or equitable
> interest defies logic***. Fn. 6.

> "Fn, 6.  If the court looks to the date of the foreclosure sale, Ibanez
> fares no better.  It is simply implausible to believe that had the
> foreclosing entity been given prior proper authority to foreclose (as
> the Ibanez decision requires), the outcome would have been any
> different.  Sand Canyon - the true mortgagee at the time of the
> foreclosure — is a co-defendant in this action and neither
> challenges the void foreclosure nor seeks to recover the foreclosure
> proceeds.  See Sand Canyon Mot. for J. on the Pleadings at 7."  *Id.*

Bold and italic added for emphasis.

Like the mortgagor in *Ibanez*, here too, the mortgagors/Debtors claim that the putative holder of their mortgage at the time of the foreclosure sale was GNMA. And like the putative holder of the mortgage in *Ibanez*, Sand Canyon, here too, the putative holder of the mortgage, GNMA, "neither challenges the [allegedly] void foreclosure nor seeks to recover the foreclosure proceeds."  Quite to the contrary, when Debtors sued GNMA and MidFirst in their post-Bankruptcy federal action, GNMA filed a motion to dismiss (See Exhibit 4 hereto) in which it affirmatively stated that MidFirst was the true holder of the mortgage loan at the time of the foreclosure.

See also *Souza v. Bank of Am.*, 2013 U.S. Dist. LEXIS 94663, *7-8 and *13-14, 2013 WL 3457185 (D. Mass. July 8, 2013)[10]:

> Bank of America also argues that Souza's claims fail under the
> doctrine of judicial estoppel because plaintiff surrendered her
> home in a bankruptcy proceeding in which she received a
> discharge of personal liability of the debt.  "[T]he doctrine of
> judicial estoppel prevents a litigant from pressing a claim that is
> inconsistent with a position taken by that litigant either in a prior
> legal proceeding or in an earlier phase of the same legal
> proceeding."  InterGen N.V. v. Grina, 344 F.3d 134, 144 (1st Cir.
> 2003).  One court has held that the doctrine of judicial estoppel
> prevents a mortgagor  from challenging the "foreclosure of the

---

[10]    A copy of the *Souza* decision is filed herewith.

same property that he surrendered in the Bankruptcy Court in exchange for the discharge of his debts." Ibanez v. U.S. Bank Nat'l Ass'n, 856 F. Supp. 2d 273, 275 (D. Mass. 2012). The court stated that "even were there a [plausible] claim, it does not belong to [the mortgagor]" but instead to the bankruptcy trustee. Id. at 276. Because Souza surrendered her home in bankruptcy, the doctrine of judicial estoppel bars her claims challenging the foreclosure process.

In a similar view, defendant argues that Souza does not have standing to assert that Bank of America's foreclosure would violate Eaton because she could not be harmed by a failure to unite the note and mortgage at foreclosure. The discharge of plaintiff's promissory note in bankruptcy precludes any possibility of a double recovery against Souza on the home loan. Plaintiff's supplemental brief does not address her standing to raise an Eaton issue. Her surrender of the property has deprived Souza of standing to challenge its foreclosure.

¶¶

Moreover, the damages plaintiff seeks are the costs of defending against the foreclosure. Given the fact that the plaintiff gave up her rights to the home in the bankruptcy proceeding, she is estopped from claiming these damages.

See also *In re Plummer*, 513 B.R. 135, 143-144 (Bankr. M.D. Fla. 2014):

Although we know what surrender does not require—turnover of physical possession—the definition of "surrender" in § 521(a)(2) is still murky. The common element appears to require a debtor to relinquish his rights in the collateral. When a debtor states his intent to surrender collateral under § 521(a)(2)(A), he complies with that intention, for purposes of § 521(a)(2)(B), ***when he allows the secured creditor (or in rare cases the Chapter 7 trustee) to obtain possession by available legal means without interference***. The debtor is not required to take any affirmative action to physically deliver the property. ***But the debtor cannot impede the creditor's efforts to take possession of its collateral by available legal means***. If the debtor fails comply with his intention, courts have employed a variety of remedies, such as relief from stay, motions to compel compliance, and dismissal of the case under § 707(a).

Bold and italics added for emphasis.

"Under § 105, Congress expressly grants court's independent statutory powers in bankruptcy proceedings to 'carry out the provisions of' the Bankruptcy Code through 'any order, process, or judgment that is necessary or appropriate.' 11 U.S.C. § 105(a)." *Jove Eng'g, Inc. v. IRS*, 92 F.3d 1539, 1553 (11th Cir. 1996).

Thus, "[w]hile a creditor may be able to invoke the doctrine of judicial estoppel in state court to force debtors to keep a promise made in bankruptcy court, its availability does not affect the statutory authority of bankruptcy judges to remedy abuses that occur in *their* courts. And there is nothing strange about bankruptcy judges entering orders that command a party to do something in a nonbankruptcy proceeding. Bankruptcy courts 'regularly exercise jurisdiction to tell parties what they can or cannot do in a non-bankruptcy forum.' *In re Lapeyre*, 544 B.R. 719, 723 (Bankr. S.D. Fla. 2016)." *In re Failla, supra*, at pp. 15 -16. Italics in original.

Finally, this Court also has the inherent power to enter an order deeming the Property surrendered and directing the Debtors to withdraw their affirmative defenses and dismiss their counterclaims in the State Court Actions and to cease and desist from any further opposition to MidFirst's exercise of its state law remedies to obtain possession.

In *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2s 27 (1991), the Supreme Court explained that the Court possess inherent powers which "necessarily result … from the nature of their institution … [and] cannot be dispensed with in a Court, because they are necessary to the exercise of all other[] [powers]." 501 U.S. at 43, 111 S. Ct. at 2132. Among these powers, "it is firmly established that the power to punish for contempts is inherent in all courts." *Chambers*, 501 U.S. at 44, 111 S. Ct. at 2132 (internal quotations omitted).

The Supreme Court made clear that these inherent powers arise independently of any statute or rule, stating:

These powers are governed not by rule or statute but by the control
necessarily vested in courts to manage their own affairs so as to
achieve the orderly and expeditious disposition of cases. . . .  We
discern no basis for holding that the sanctioning scheme of the
statute and the rules displaces the inherent power to impose
sanctions for the bad-faith conduct described above.  These other
mechanisms, taken alone or together, are not substitutes for the
inherent power, for that power is both broader and narrower than
other means of imposing sanctions.  First, where as each of the
other mechanisms reaches only certain individuals or conduct, the
inherent power extends to a full range of litigation abuses.  At the
very least, the inherent power must continue to exist to fill in the
interstices. . . .  The inherent power of a court can be invoked even
if procedural rules exists which sanction the same conduct. . . .
[A] federal court [is not] forbidden to sanction bad-faith conduct
by means of the inherent power simply because that conduct could
also be sanctioned under the statute or the Rules.

*Chambers*, 501 U.S. at 43-50, 111 S. Ct. at 2132-36 (internal quotations omitted).

The *Chambers* court warned that a court must "exercise caution in invoking its inherent

power," stating:

Because of their very potency, inherent powers must be exercised
with restraint and discretion. A primary aspect of that discretion is
the ability to fashion an appropriate sanction for conduct which
abuses the judicial process…. When there is bad-faith conduct in
the course of litigation that could be adequately sanctioned under
the Rules, the court ordinarily should rely on the Rules rather than
the inherent power. But if in the informed discretion of the court,
neither the statute nor the Rules are up to the task, the court may
safely rely on its inherent power.

*Id*. at 44-45, 50, 111 S. Ct. at 2132-33, 2136.  See also *Jove Eng'g, Inc. v. IRS, supra*, 92

F.3d at 1554 discussing *Chambers* in relation to the Bankruptcy Court's inherent power as well

as its power under 11 U.S.C. § 105(a).  The facts of this case represent a prime example of where

the inherent power may be readily employed.

WHEREFORE, the premises being considered, the motion must be granted and the Debtors ordered to cease and desist their opposition in the pending state court actions and to dismiss their counterclaims and withdraw their answers and affirmative defenses filed therein.

**Within fourteen (14) days after service as evidenced by the certification, and an additional three (3) days pursuant to Fed. R. Bank. P. 9006(f) if served by mail, any party against whom such paper has been served, or any other party who objects to the relief sought, shall serve and file an objection or other appropriate response to said paper with the Bankruptcy Court Clerk's Office, 380 Westminster Street, 6th Floor, Providence, RI 02903, (401) 626-3100.  If no objection or other response is timely filed, the paper will be deemed unopposed and will be granted unless: (1) the requested relief is forbidden by law; (2) the requested relief is against public policy; or (3) in the opinion of the Court, the interest of justice requires otherwise.**

Date:  November 30, 2016.

Respectfully submitted,

MidFirst Bank
By its attorney,

/s/ Walter H. Porr, Jr., Esq.
Walter H. Porr, Jr., Esquire
RI# 8967
Korde & Associates, P.C.
900 Chelmsford Street, Suite 3102
Lowell, MA 01851
Tel: (978) 256-1500
bankruptcy@kordeassociates.com

23

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF RHODE ISLAND

| In Re: | Case Number 09-11809-DF |
|---|---|
| Adriano Freire and Lourdes Mendes | Chapter 13 |

### CERTIFICATE OF SERVICE

I, Walter H. Porr, Jr., Attorney for **MidFirst Bank** hereby certify that on November 30, 2016 I electronically filed the foregoing *Motion to Compel Surrender* with the United States Bankruptcy Court for the District of Rhode Island using the CM/ECF System. I served the foregoing documents on the following CF/ECF participants;

Gary L. Donahue, U.S. Trustee
John Boyajian, Trustee
John B. Ennis, Esquire

I certify that I have mailed by first class mail, postage prepaid the documents electronically filed with the Court on the following non-CM/ECF participants:

Adriano Freire
204 Morris Avenue
Pawtucket, RI 02860


Lourdes Mendes
204 Morris Avenue
Pawtucket, RI 02860

/s/ Walter H. Porr, Jr., Esq.
Walter H. Porr, Jr., Esquire
RI# 8967
Korde & Associates, P.C.
900 Chelmsford Street, Suite 3102
Lowell, MA 01851
Tel: (978) 256-1500
bankruptcy@kordeassociates.com